UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | **EDCV 13-0646 JGB (SPx)** | | Date | May 18, 2015 |
|---|---|---|---|---|

| Title | *Sherry Dobrosky v. Arthur J. Gallagher Service Company LLC* |
|---|---|

| Present: The Honorable | JESUS G. BERNAL, UNITED STATES DISTRICT JUDGE |
|---|---|

| MAYNOR GALVEZ | ADELE C. FRAZIER |
|---|---|
| Deputy Clerk | Court Reporter |

| Attorney(s) Present for Plaintiff(s): | Attorney(s) Present for Defendant(s): |
|---|---|
| Aparajit Bhowmik | Douglass Roger Hart |
| Ruchira Piya Mukherjee | Katherine Ann Roberts |

**Proceedings:** **HEARING ON MOTION AND Order GRANTING IN PART and DENYING IN PART Defendant's Motion for Summary Judgment (Doc. No. 47)**

Before the Court is Defendant's motion for summary judgment. (Doc. No. 47.) After considering the papers filed in support of and in opposition to the motion, and the arguments presented at the May 18, 2015, hearing, the Court GRANTS IN PART and DENIES IN PART Defendant's motion for summary judgment.

## I. BACKGROUND

On February 22, 2013, Plaintiff Sherry Dobrosky ("Plaintiff" or "Dobrosky") filed a putative class action complaint in California Superior Court for the County of Riverside against Defendant Arthur J. Gallagher Service Company, LLC ("Defendant"). ("Complaint," Doc. No. 1 at 9-47.) Defendant answered the Complaint on April 5, 2013, (Doc. No. 1 at 51-60), and removed the action to this Court on April 9, 2013, (Not. of Removal, Doc. No. 1 at 1-6).

On March 26, 2014, pursuant to a stipulation by the parties, Plaintiff filed the operative First Amended Complaint. ("FAC," Doc. No. 24.) The FAC sets forth five causes of action under California law. The factual allegations include that Defendant improperly classified the claims adjusters and senior claims adjusters in Defendant's workers' compensation division—including Plaintiff and a class of California claims adjusters—as exempt, salaried employees, and thus denied them overtime compensation and other benefits required by California labor law. (FAC ¶¶ 2-10.) Defendant answered the FAC on April 25, 2014. ("Answer," Doc. No. 29.) As one of its affirmative defenses, Defendant asserted that Plaintiff and the putative class members

had been properly classified as exempt from overtime requirements under California law. (Answer ¶ 25.)

Plaintiff filed a motion for class certification on February 27, 2014.  (Doc. No. 19.)  On April 25, 2014, Defendant opposed the motion, (Doc. No. 27), and filed a motion to disqualify Plaintiff's expert, David Pilcher, (Doc. No. 28).  On July 30, 2014, the Court granted in part Defendant's motion to disqualify Pilcher as an expert and granted Plaintiff's motion for class certification.  ("Order," Doc. No. 42.)  The class was defined as "[a]ll individuals who are or previously were employed by Defendant Arthur J. Gallagher Service Company, LLC as Claims Adjusters and Senior Claims Adjusters in Defendant's Workers' Compensation Division [in California] between May 5, 2011, and June 9, 2014."  (Id. at 6 (second alteration in original).)

On February 2, 2015, Defendant filed a motion for summary judgment as to all claims alleged by Plaintiff.  ("Motion," Doc. No. 47-1.)  In support of its Motion, Defendant filed the following documents:
- Declaration of Jeff Ponta, ("Ponta Decl.," Doc. No. 47-3), attaching seven exhibits[1];
- Declaration of Christopher Neigel, ("Neigel Decl.," Doc. No. 47-4), attaching twenty-four exhibits; and
- Declaration of Katherine A. Roberts, ("Roberts Decl.," Doc. No. 47-5), attaching twenty-six exhibits.

With the Court's leave, Defendant filed its Separate Statement of Undisputed Facts on February 17, 2015.  ("SUF," Doc. No. 53-2.)

Plaintiff opposed Defendant's Motion on February 25, 2015, ("Opp'n," Doc. No. 55), and filed the following supporting documents:
- Separate Statement of Genuine Issues, ("SGI," Doc. No. 55-1 at 1-48);
- Statement of Additional Facts, ("SAF," Doc. No. 55-1 at 49-58);
- Declaration of Aparajit Bhowmik, ("Bhowmik Decl.," Doc. No. 55-2), attaching seventeen exhibits, (Doc. Nos. 55-2 to -3);
- Declaration of Eric Lietzow, ("Lietzow Decl.," Doc. No. 55-4), attaching three exhibits; and
- Declaration of David E. Pilcher, ("Pilcher Decl.," Doc. No. 55-5).

On March 18, 2015, Plaintiff also filed a Request for Judicial Notice.  ("PRJN," Doc. No. 57.)[2]

---

[1] Defendant applied to seal the seven exhibits attached to the Ponta Declaration.  (Doc. No. 48.)  The Court discusses that application to seal below.

[2] Plaintiff asks the Court to judicially notice a January 30, 2015, decision from California Superior Court for the County of Sacramento.  (RJN at 1.)  It is entirely unnecessary for the Court to take judicial notice of a court case providing persuasive authority; the Court's attention may be directed to such cases without requesting judicial notice.  See Wise v. Reliastar Life Ins. Co., No. 06-7360 SC, 2007 WL 2790066, at *2 (N.D. Cal. Sept. 20, 2007).  Nevertheless, a court (continued . . . )

Defendant filed its reply brief on March 30, 2015, ("Reply," Doc. No. 58), along with the following documents:

- Reply to Plaintiff's Statement of Genuine Issues, (Doc. No. 58-1 at 1-77)[3];
- Response to Plaintiff's Statement of Additional Facts, ("RSAF," Doc. No. 58-1 at 78-101);
- Declaration of Lauren M. Kulpa in Support of Defendant's Reply to Plaintiff's Statement of Genuine Issues, ("Kulpa Decl. SGI," Doc. No. 58-2), attaching one exhibit;
- Objections to Plaintiff's Evidence, ("Obj.," Doc. No. 58-3);
- Objection to the Declaration and Report of Eric R. Lietzow, ("Obj. Leitzow," Doc. No. 58-4);
- Declaration of Lauren M. Kulpa in Support of Defendant's Objection to the Declaration and Report of Eric R. Lietzow, ("Kulpa Decl. Obj. Leitzow," Doc. No. 58-5);
- Objection to the Declaration and Report of David E. Pilcher, ("Obj. Pilcher," Doc. No. 58-6);
- Declaration of Lauren M. Kulpa in Support of Defendant's Objection to the Declaration and Report of David E. Pilcher, ("Kulpa Decl. Obj. Pilcher," Doc. No. 58-7);
- Opposition to Plaintiff's Request for Judicial Notice, ("Opp'n RJN," Doc. No. 56-8); and
- Request for Judicial Notice, ("DRJN," Doc. No. 58-9).[4]

The Court heard oral argument from the parties on May 18, 2015.

---

( . . . continued)
"may take judicial notice of the existence of another court's opinion." Metro. Creditors' Trust v. Pricewaterhousecoopers, LLP, 463 F. Supp. 2d 1193, 1198 (E.D. Wash. 2006); accord Bias v. Moynihan, 508 F.3d 1212, 1225 (9th Cir. 2007). Accordingly, the Court GRANTS Plaintiff's request for judicial notice. However, the Court notes that the case provides only persuasive authority, and Plaintiff has failed to direct the Court's attention to relevant points or passages.

[3] Defendant improperly submits a "reply" to Plaintiffs statement of genuine issues. The Court's standing order sets forth the appropriate submissions for moving for, and opposing, summary judgment; a movant's reply to a statement of genuine disputes is nowhere mentioned. (Standing Order at 5-9.) Such a reply merely adds unnecessary volume to the record before the Court. Accordingly, the Court declines to consider Defendant's reply to Plaintiff's statement of genuine issues. (Doc. No. 58-1 at 1-77.)

[4] Defendant asks this Court to take judicial notice of four U.S. Department of Labor Wage and Hour opinion letters. Judicial notice is appropriate where documents are publicly available and capable of accurate and ready determination. See Mir v. Little Co. of Mary Hosp., 844 F.2d 646, 649 (9th Cir. 1988) (taking judicial notice of public records). Accordingly, Defendant's request for judicial notice is GRANTED.

---

**CIVIL MINUTES—GENERAL**   Initials of Deputy Clerk MG / TIME: 00:35

## II.  LEGAL STANDARD

A motion for summary judgment shall be granted when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986).  The moving party must show that "under the governing law, there can be but one reasonable conclusion as to the verdict."  Anderson, 477 U.S. at 250.

Generally, the burden is on the moving party to demonstrate its entitlement to summary judgment.  Margolis v. Ryan, 140 F.3d 850, 852 (9th Cir. 1998); Retail Clerks Union Local 648 v. Hub Pharmacy, Inc., 707 F.2d 1030, 1033 (9th Cir. 1983).  The moving party bears the initial burden of identifying the elements of the claim or defense and presenting evidence that it believes demonstrates the absence of an issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

When the non-moving party has the burden at trial, however, the moving party need not produce evidence negating or disproving every essential element of the non-moving party's case. Id. at 325.  Instead, the moving party's burden is met by pointing out an absence of evidence supporting the non-moving party's case.  Id.  The burden then shifts to the non-moving party to show that there is a genuine issue of material fact that must be resolved at trial.  Fed. R. Civ. P. 56(e); Celotex, 477 U.S. at 324; Anderson, 477 U.S. at 256.  The non-moving party must make an affirmative showing on all matters placed in issue by the motion as to which it has the burden of proof at trial.  Celotex, 477 U.S. at 322; Anderson, 477 U.S. at 252; see also William W. Schwarzer, A. Wallace Tashima & James M. Wagstaffe, Federal Civil Procedure Before Trial, 14:144.  "This burden is not a light one.  The non-moving party must show more than the mere existence of a scintilla of evidence."  In re Oracle Corp. Sec. Litig., 627 F.3d 376, 387 (9th Cir. 2010) (citing Anderson, 477 U.S. at 252).  "The non-moving party must do more than show there is some 'metaphysical doubt' as to the material facts at issue."  Id. at 387 (citing Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986)).

If the moving party bears the burden of proof at trial, it "must affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party."  Soremekun v. Thrifty Payless, Inc., 509 F.3d 978, 984 (9th Cir. 2007); see also Torres Vargas v. Santiago Cummings, 149 F.3d 29, 35 (1st Cir. 1998) ("The party who has the burden of proof on a dispositive issue cannot attain summary judgment unless the evidence that he provides on that issue is conclusive.").  Instead, Rule 56 requires the moving party to show it is entitled to judgment as a matter of law.  See Fed. R. Civ. P. 56(a); Anderson, 477 U.S. at 250 ("[The summary judgment] standard mirrors the directed verdict standard under Federal Rule of Civil Procedure 50(a).").

A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the non-moving party."  Anderson, 477 U.S. at 248.  When ruling on a motion for summary judgment, the Court construes the evidence in the light most favorable to the non-moving party.  Barlow v. Ground, 943 F.2d 1132, 1135 (9th Cir. 1991); T.W. Elec. Serv. Inc. v. Pac. Elec. Contractors Ass'n, 809 F.2d 626, 630-31 (9th Cir. 1987).

## III. DISCUSSION

Defendant moves for summary judgment, arguing that class members are properly classified as exempt from California overtime requirements under the California administrative exemption.  If the Court concludes that summary judgment is not appropriate on that ground, Defendant alternatively moves for partial summary judgment on each prong of the administrative exemption test as well as on Plaintiff's claim for meal break violations.  The Court first addresses certain procedural matters, and then summarizes the facts of the case, before turning to Defendant's arguments.

### A.  Motion to Seal

Defendant applies to seal seven exhibits attached to the Ponta Declaration.  (Doc. No. 48.)  The Court has reviewed those exhibits, and the documents submitted in support of the application to seal, (Doc. Nos. 49, 50), and concludes that compelling reasons exist for sealing them.

Historically, courts have recognized a "general right to inspect and copy public records and documents, including judicial records and documents."  Nixon v. Warner Commc'ns, Inc., 435 U.S. 589, 597, n.7 (1978).  "Unless a particular court record is one 'traditionally kept secret,' a 'strong presumption in favor of access' is the starting point."  Kamakana v. City & Cnty. of Honolulu, 447 F.3d 1172, 1178 (9th Cir. 2006) (quoting Foltz v. State Farm Mut. Auto. Ins. Co., 331 F.3d 1122, 1135 (9th Cir. 2003)).  In order to overcome that strong presumption, a party seeking to seal a judicial record must articulate justifications for sealing that outweigh the public policies favoring disclosure.  See id. at 1178–79.  Because the public's interest in non-dispositive motions is relatively low, a party seeking to seal a document attached to a non-dispositive motion need only demonstrate "good cause."  Pintos v. Pac. Creditors Ass'n, 605 F.3d 665, 678 (9th Cir. 2010) (applying a "good cause" standard to non-dispositive motions because such motions "are often unrelated, or only tangentially related, to the underlying cause of action") (internal quotation marks and citation omitted).

Conversely, "the resolution of a dispute on the merits, whether by trial or summary judgment, is at the heart of the interest in ensuring the 'public's understanding of the judicial process and of significant public events.'"  Kamakana, 447 F.3d at 1179 (quoting Valley Broadcasting Co. v. U.S. Dist. Ct. for Dist. of Nev., 798 F.2d 1289, 1294 (9th Cir. 1986)).  Thus a party seeking to seal a judicial record attached to a dispositive motion or presented at trial must articulate "compelling reasons" in favor of sealing.  See id. at 1178.  "The mere fact that the production of records may lead to a litigant's embarrassment, incrimination, or exposure to further litigation will not, without more, compel the court to seal its records."  Id. at 1179 (citing Foltz, 331 F.3d at 1136).  "In general, 'compelling reasons' . . . exist when such 'court files might have become a vehicle for improper purposes,' such as the use of records to gratify private spite, promote public scandal, circulate libelous statements, or release trade secrets."  Id. (citing Nixon, 435 U.S. at 598).

For purposes of sealing, the Ninth Circuit has adopted the definition of "trade secrets" set forth in the Restatement of Torts, holding that "[a] trade secret may consist of any formula,

pattern, device or compilation of information which is used in one's business, and which gives him an opportunity to obtain an advantage over competitors who do not know or use it." Clark v. Bunker, 453 F.2d 1006, 1009 (9th Cir. 1972) (quoting Restatement of Torts § 757, cmt. b). Additionally, "compelling reasons" may exist if sealing is required to prevent judicial documents from being used "'as sources of business information that might harm a litigant's competitive standing.'" In re Elec. Arts, Inc., 298 F. App'x 568, 569 (9th Cir. 2008) (quoting Nixon, 435 U.S. at 598).

The seven exhibits sought to be sealed by Defendant include numerous trade secrets as well as confidential client information. Specifically, Exhibits 1 through 5 consist of internal claims handling procedures and training documents about those procedures. Making those documents publicly available would allow competitors to easily adopt the procedures developed and implemented by Defendant without incurring the expenses associated with developing their own procedures and training materials. Thus sealing is necessary to prevent the publication of Defendant's trade secrets. Exhibits 6 and 7 consist of client service instructions, explaining the services provided by Defendant to its clients. Those documents include the names and contact information for the clients' employees as well as confidential information about the clients' businesses, including their trade secrets.

The Court finds compelling reasons to seal the exhibits and GRANTS Defendant's application to seal Exhibits 1 through 7 to the Ponta Declaration.

The Court cites to and quotes from some of Defendant's sealed exhibits throughout this order—particularly, the Corporate Best Practices document, which Defendant submitted under seal as Exhibit 1 to the Ponta Declaration. The Court determines that these portions of the Court's order need not be redacted despite sealing the complete documents. Although making the full Best Practices and training documents available to the public would allow Defendant's competitors to obtain an advantage, short quotations will not damage Defendant's competitive advantage.

### B. Objections to Evidence

Plaintiff does not raise any objections to Defendant's evidence. Defendant, however, objects to certain pieces of evidence relied upon by Plaintiff. Most significantly, Defendant objects to Plaintiff's reliance on the Declaration of David Pilcher in support of certain facts in Plaintiffs' Statement of Additional Facts. (Obj. at 5-6; SAF ¶¶ 49, 50, 58, 59.) Specifically, Plaintiff relies on Pilcher's opinions as to whether Adjusters were required to follow certain protocols, characterizations of certain documents in evidence, and opinions as to whether Adjusters assert independent judgment or merely perform routine, clerical tasks. (Id.) The Court agrees that those opinions do not form a sufficient basis for asserting a fact on which Plaintiff may rely to oppose summary judgment. Rather, those opinions constitute legal conclusions and/or express conclusions which do not require the application of any expertise, and they are thus not helpful to the Court in considering the evidence. See Fed. R. Evid. 701, 702. Accordingly, the Court SUSTAINS Defendant's objections to the statements by Pilcher upon which Plaintiff relies in her Statement of Additional Facts. (SAF ¶¶ 49, 50, 58, 59.) The Court does not rely on that evidence in considering this Motion.

With regard to Defendant's other evidentiary objections, the Court has not found it necessary to rely on the evidence at issue.[5]  Accordingly, the Court DENIES AS MOOT Defendant's remaining evidentiary objections.

## C.  Facts

Except as noted, the following material facts are sufficiently supported by admissible evidence and are uncontroverted.  They are "admitted to exist without controversy" for the purpose of this Motion for Summary Judgment.  L.R. 56-3 (facts not "controverted by declaration or other written evidence" are assumed to exist without controversy); accord Fed. R. Civ. P. 56(e)(2) (stating that where a party fails to address another party's assertion of fact properly, the court may "consider the fact undisputed for purposes of the motion").

Defendant Arthur J. Gallagher Service Company, LLC, is a third-party insurance claims administrator.  (SUF ¶ 1.)  In its workers' compensation division, Defendant employs claims adjusters and senior claims adjusters (collectively, "Adjusters"), who comprise the pertinent class of plaintiffs in this case.  During the class period, Defendant employed at least 416 employees as Adjusters.  (SAF ¶ 2.)  Adjusters are classified as exempt from receiving overtime compensation.  (SAF ¶ 4.)

Separate from Adjusters, Defendant also employs non-exempt "medical only" adjusters who handle lower value, medical-only claims involving much less significant injuries worth less than $2,500 and involving only basic medical reports.  (SUF ¶ 3.)  In addition, Defendant employs non-exempt claims assistants who support Adjusters by handling clerical tasks, such as sending notices and processing payments.  (SUF ¶ 4.)

Plaintiff was a senior claims adjuster from 2001 to 2005 and 2008 to 2012 and a claims supervisor from 2005 to 2008.  (SUF ¶ 5.)  Upon commencing her employment with Defendant, Plaintiff had more than fourteen years' experience in multiple roles in the insurance business and was certified to adjust self-insured claims.  (SUF ¶ 7.)

### 1.  Instruction and Training

Defendant's Adjusters must have a high school diploma and be licensed by the State of California after passing a State-administered examination on the topic of workers' compensation claims handling.  (SAF ¶ 42.)  When performing their work, Adjusters rely on their knowledge, training, and years of experience.  (SAF ¶¶ 43-44.)  Candidates for Adjuster positions with Defendant must typically have at least two to five years of experience.  (SUF ¶ 96.)  Adjusters must complete thirty credits of continuing education every two years.  (SUF ¶ 98.)

---

[5] For example, as discussed below, the Court declines to rely on the Report of Eric R. Lietzow as establishing facts related to Plaintiff's meal break claim.

Defendant's Workers' Compensation Corporate Best Practices document provides "guidance and instruction" to Adjusters by "defin[ing] the level of performance against which [Defendant] measures the quality of the claim management" provided by the Adjusters. ("Best Practices," Bhowmik Decl., Ex. 8, Doc. No. 55-2 at 196.) The Best Practices document includes some outlines, forms/worksheets, and templates to be used by Adjusters when performing their work. (SAF ¶ 50; Best Practices at 217-18, 221.) The parties dispute whether Adjusters were required to follow the procedures outlined in the Best Practices, (SAF ¶ 49), or whether they merely provided a helpful example, (RSAF ¶ 49). Many clients also provide client service instructions ("CSIs") which are unique to each client. (SUF ¶ 85.)

### 2.  Work Responsibilities

The work of Adjusters consists primarily of (i) investigating claims and interviewing witnesses, (ii) evaluating coverage, potential liability, and damages, (iii) developing specific plans of action for resolving claims, (iv) determining the appropriate amount of reserves, (v) determining the necessity of hiring investigators or other vendors, (vi) evaluating the potential for subrogation against third parties, (vii) making eligibility determinations, (viii) overseeing the work of defense attorneys and managing litigation, (iv) evaluating potential liability and damages, and (v) negotiating settlements. (SUF ¶ 2.)

Adjusters are generally responsible for between 110 to 170 claims at any given time. (SUF ¶ 39.) Adjusters do not have authority to formulate management or operating policies, (SAF ¶¶ 10-11), and are thus not authorized to waive or violate Defendant's established policies, (SAF ¶ 12).

#### a.  Investigations

During their investigations, Adjusters identify and interview three specified parties—the claimant, employer, and medical provider—as well as other witnesses. (SGI ¶ 8.) While investigating, Adjusters assess the credibility of witnesses. (SUF ¶ 11.) If an Adjuster doubts a witness's story, she might interview other witnesses to check the accuracy of the first witness's account. (SUF ¶ 10.)

The parties dispute what degree of independent judgment and discretion Adjusters employ during their investigations. Defendant does not provide comprehensive scripts or templates for Adjusters to use during their interviews. (SUF ¶ 11; SGI ¶ 11.) Defendant asserts that Adjusters are responsible for deciding the lines of questioning to pursue during an interview, (SUF ¶ 12), but Plaintiff points out that Defendant provides an outline of the information that an Adjuster should obtain during an interview and that supervisors ensure that Adjusters follow that outline, (SGI ¶ 12; Best Practices at 217).

When conducting their investigations, Adjusters look for indications of possible fraud or subrogation, which occurs when a third party bears some liability for the claim. (SUF ¶¶ 15-16; SGI ¶ 15.) The parties dispute the level of independent judgment required to identify fraud. Defendant asserts that Adjusters make credibility assessments and then recommend a course of action. (SUF ¶¶ 17-18.) In contrast, Plaintiff testified at her deposition that she relied on

objective indicators of fraud and then submitted information to "higher ups," who decide whether to engage an investigation unit to pursue the potential fraud claim. (SGI ¶ 17.) Plaintiff explained that Adjusters must have approval before turning their file over to the Department of Insurance for a potential criminal prosecution. (SGI ¶ 21.)

Sometimes Adjusters recommend to their client and/or their supervisor that a third-party investigator or other vendor should be engaged to aid in the investigation. (SUF ¶ 13.) Thereafter, if a client provides a panel of potential vendors, the Adjuster selects the investigator and assigns work to him or her. (SUF ¶ 14.) It is undisputed that, when third-party investigators are involved in potential cases of fraud, Adjusters may direct them on how to conduct their investigations. (SUF ¶¶ 19-20.)

### b.  Recommendations

Adjusters make recommendations as to whether to accept or reject a workers' compensation insurance risk based on the information that they acquire through their investigations. (SAF ¶ 45; RSAF ¶ 45.) Adjusters also base their recommendations on the standards prescribed by the California Labor Code, which outlines the acceptable levels of compensability for certain types of injuries. (SAF ¶¶ 46-47.) However, the degree of discretion involved in making these recommendations is disputed. Defendant's Best Practices document states that Adjusters always require written supervisor approval before denying or delaying benefits, either medical or indemnity. (SGI ¶ 24; Best Practices at 199.) Plaintiff testified at her deposition that her decisions were also reviewed when she recommended approving a claim. (SGI ¶ 27.) However, Defendant asserts that supervisor approval "may" be required for recommendations of denial, (SUF ¶ 25), and notes that Plaintiff testified that her compensability determinations were only overturned two or three times per year, (SUF ¶ 28).

### c.  Planning and Reserves

For each claim, the assigned Adjuster must develop a specific plan of action for resolving the claim. (SUF ¶ 30.) Adjusters document their plan for handling the claim through its conclusion and update the plan periodically based on new information received. (SUF ¶ 31.) Each plan must be tailored to the facts of the case and identify objectives and steps to achieve them. (SUF ¶ 32.) Adjusters are required to outline each new claim in a claim notebook using a Best Practices document entitled the Theory of Compensability Framework. (SUF ¶ 79.)

In their plans, Adjusters include information about reserves. (SUF ¶ 33.) A reserve is the amount of money that is set aside to cover the life of the claim. (SUF ¶ 35.) Under-reserving a claim can lead to legal consequences, whereas over-reserving a claim ties up money that the client could otherwise utilize for other purposes. (SUF ¶¶ 36-37.)

The parties dispute the amount of discretion that Adjusters may exercise as well as the degree to which Adjusters are supervised when determining appropriate reserves. The parties agree that Adjusters apply their knowledge, experience, and evaluation of intangible factors when determining the appropriate reserve amount. (SUF ¶¶ 33-34, 42.) According to the Best Practices document, reserves are determined based on a number of factors, including the

claimant's injury, education, age, work experience, attitude, and physical condition, as well as the employer's attitude, the quality of medical care, and the applicable workers' compensation law. (SUF ¶ 80.) However, Plaintiff contends that such a characterization of reserve-setting is incomplete and that Adjusters do not independently determine the reserve. (SGI ¶¶ 33-34.) Instead, Plaintiff asserts that Adjusters utilize MIRA,[6] a reserve-setting mechanism that predicts the appropriate level of reserves based on past data; if the Adjuster's reserve deviates from the predicted amount by more than ten percent, the Adjuster must articulate his or her reasoning, presumably so that a supervisor can review it. (SGI ¶ 34; "Ponta Depo. 1" at 129-130, Bhowmik Decl., Ex. 2, Doc. No. 55-2.)

Plaintiff contends that the setting of reserves is subject to much supervision, including initial and subsequent reserve evaluations by supervisors in addition to intermittent reports run by supervisors, which branch managers are expected to review every day. (SGI ¶ 33; Ponta Depo. 1 at 73-74; "Ponta Depo. 2" at 80-81, Bhowmik Decl., Ex. 5, Doc. No. 55-2.) Defendant provides each Adjuster a certain level of reserve authority based on her level of knowledge and experience, (SUF ¶ 49), and individual clients may also choose to set different authority levels, (SUF ¶ 51). An Adjuster may set a reserve without preapproval if the reserve amount is within her authority; if the amount exceeds her authority, she must seek approval from a supervisor or the client. (SUF ¶¶ 53-54.) Plaintiff testified that most of her recommendations as to reserve amount were approved. (SUF ¶ 60.)

The parties do not dispute that several tools assist Adjusters with setting the reserves but that no formula precisely determines each reserve. (SUF ¶ 40; SGI ¶ 40.) However, they disagree regarding how much the tools determine and what is left to the discretion of the Adjuster. For example, Plaintiff asserts that the PDR permanent rating guide provides a formula for determining the degree of permanent disability associated with a particular injury. (SGI ¶ 40.) Moreover, the Best Practices document includes a Standard Total Experience Worksheet that assists with calculating the reserve. (Best Practices at 218; Ponta Depo. 2 at 56-57.)

### d. Litigation

Multiple Adjusters testified that they handle a significant number of litigated claims. (SUF ¶ 64.) If a claim handled by an Adjuster is litigated, the Adjuster works closely with defense counsel. (SUF ¶ 63.) Adjusters advise defense counsel on litigated claims, including what depositions to take and which records to subpoena. (SUF ¶ 65.)

### e. Negotiation

When a claimant has been declared "permanent and stationary," the Adjuster can determine an appropriate settlement offer and attempt to negotiate a settlement of the claim. (SUF ¶¶ 66-67.) If a settlement amount is within an Adjuster's authority, she may make a settlement offer without preapproval from a supervisor. (SUF ¶ 68.) Otherwise, the Adjuster can seek preapproval from a supervisor or the client. (SUF ¶ 70.) Adjusters or legal counsel

---

[6] However, MIRA was not used on self-insured accounts. (SUF ¶ 48.)

negotiate the settlements, but Adjusters are instructed not to cede control to the attorneys.  (SUF ¶¶ 74-75.)

### 3.  Supervision

Every Adjuster reports to a claims supervisor, (SAF ¶ 14), and only five to six Adjusters report to each claims supervisor, (SAF ¶ 15).  One supervisor testified that she was responsible for as many as 750 claims at a time.  (SUF ¶ 104.)  In general, each claim diary is reviewed by a claims supervisor within thirty days of opening the claim and then at least every ninety days thereafter.  (SUF ¶ 103; Best Practices at 198.)  However, certain claims—those that are questionable, delayed, denied, litigated, or controlled loss claims—are reviewed every thirty days.  (SUF ¶ 103; SGI ¶ 103; Best Practices at 198.)  Adjusters are expected to continue to work their files regardless of whether their claims have been reviewed by a claims supervisor.  (SUF ¶ 105.)

The parties dispute the extent and purpose of the supervision over Adjusters.  Defendant points to testimony from one claims supervisor that claim reviews merely constituted a "check-up" to make sure claims were being properly documented and deadlines met.  (SUF ¶ 106.)  Plaintiff, however, points to the Claims Supervisor Job Description, which provides that each claims supervisor "[a]ctively manages assigned adjusters['] workloads and performance."  (SAF ¶ 16; "Claims Supervisor Job Description," Bhowmik Decl., Ex. 9, Doc. No. 55-2 at 224.)  Plaintiff points to testimony from Defendant's 30(b)(6) deponent that the function of a claims supervisor is to determine whether Adjusters are performing their jobs as expected by Defendant.  (SAF ¶ 17; RSAF ¶ 17.)

Claims supervisors use "various metric driven tools . . . to evaluate [Adjusters'] performance and identify problem areas in advance of them becoming service issues."  (SAF ¶ 18; RSAF ¶ 18; Claims Supervisor Job Description at 224.)  One such metric report, the Toolkit report,[7] discloses whether Adjusters have timely (i) made contact with necessary persons, (ii) recorded their plans of action, (iii) paid bills, (iv) produced detailed status reports, and (v) completed other tasks specifically assigned by the claims supervisor.  (SAF ¶¶ 19-24; RSAF ¶¶ 19-24.)  Claims supervisors also monitor fluctuations in the number of claims in an Adjuster's workload.  (SAF ¶ 26.)  If claims supervisors perceive that Adjusters are not meeting Defendant's expectations, they work directly with the Adjuster to attempt to correct any deficiency.  (SAF ¶ 27.)  Defendant's 30(b)(6) deponent, Jeff Ponta, testified that supervisors are expected to review the Toolkit report on Adjusters' work every day.  (Ponta Depo. 1 at 73-74.)  Defendant disagrees that this level of supervision is expected, citing to testimony from one claims supervisor, Joyce Grant, who asserted that it would not have been possible for her to review all claims on a daily basis.  (SUF ¶ 107; SGI ¶ 107.)

---

[7] Defendant first utilized the Claims Handling Improvement Program and later the Claim Operation Toolkit; both allowed claims supervisors to monitor whether Adjusters met Defendant's expectations.  (SAF ¶ 25.)

The parties further dispute whether claims supervisors had access to, and actually accessed, Adjusters' email. Ponta stated that supervisors have access to Adjusters' email and use that email access to "spot-check" whether Adjusters allow more than twenty-four hours to pass between when they receive email and read it. (Ponta Depo. 1 at 41.) In contrast, Defendant points to testimony from Grant, who was one of Plaintiff's supervisors. She testified that, when she was a claims supervisor, she did not spot-check her Adjusters' email. (Grant Depo. at 93.) However, Grant testified that claims supervisors now perform that task. (Id.)

### 4. Salaries

During the class period, the lowest annual salary of an Adjuster was approximately $38,000, and the highest was approximately $93,000. (SUF ¶ 112.) Adjusters were paid semi-monthly. (SUF ¶ 114.) Defendant did not reduce Adjusters' salaries based on the quality of their performance. (SUF ¶ 115.)

### 5. Meal Breaks

Defendant's written policy states that employees will generally be provided a meal period of approximately one hour each day. ("Employee HR Toolkit" § 7.03, Neigl Decl., Ex. C.) Defendant's 30(b)(6) witness, Christopher Neigel, testified at his deposition that it was his recollection that Defendant's policy provided that employees, whether exempt or non-exempt, would receive at least a thirty-minute meal break after five hours of work. ("Neigel Depo." at 50-52, Roberts Decl., Ex. 12, Doc. No. 47-5.) Plaintiff testified that it was her "standard schedule" to take a thirty-minute lunch break each day. (SUF ¶ 117; "Dobrosky Depo." at 182, Roberts Decl., Ex. 1, Doc. No. 47-5.) Grant testified that lunch at her branch office was from noon until 1:00 p.m. and that she instructed the Adjusters that they were required to take at least a thirty-minute lunch break. ("Grant Depo." at 101-02, Roberts Decl., Ex. 9, Doc. No. 47-5.) Grant stated that some Adjusters took that lunch break and some did not. (Id. at 102.)

### D. California Administrative Exemption

Defendant primarily moves for summary judgment on the basis that Adjusters are properly classified as exempt from California's overtime requirements, pursuant to the California administrative exemption found in California Industrial Wage Commission ("IWC") Order 4-2001. (Mot. at 4.)

### 1. Legal Framework

California labor law provides for overtime protections and the administrative exemption at issue in this case. However, the California administrative exemption incorporates certain federal regulations promulgated by the U.S. Department of Labor ("DOL") under the Fair Labor Standards Act ("FLSA"), which explain the federal administrative exemption. The parties disagree as to the effect that 2004 changes to the federal regulations should have on how courts interpret the California administrative exemption. Defendant asserts that the 2004 federal regulations ought control the outcome of this case, while Plaintiff maintains that the federal regulations should have a minor, if any, role in resolving this action.

### a. California Administrative Exemption

Generally, under the California Labor Code, employers are required to pay overtime to all employees who work hours beyond the standard workweek. See Campbell v. Pricewaterhouse Coopers, LLP, 642 F.3d 820, 824 (9th Cir. 2011). "However, the [IWC], a California state agency, may promulgate exemptions from mandatory overtime" through "wage orders," which are "state regulations enforced by the California Division of Labor Standards and Enforcement." Id. California Wage Order 4-2001 sets forth three exemptions from California overtime law: the professional exemption, the executive exemption, and the administrative exemption. See Cal. Code Regs. tit. 8, § 11040(1)(A) (incorporating Wage Order 4-2001 into California Code of Regulations). The dispute in this case involves the parties' differing interpretations of the administrative exemption and whether it is properly applied to Plaintiff and other Adjusters.

Whether an employee is "an exempt administrative employee presents a mixed question of law and fact because it involves the application of legal categories." Eicher v. Advanced Bus. Integrators, Inc., 151 Cal. App. 4th 1363, 1369 (Cal. Ct. App. 2007); contra Nigg v. U.S. Postal Service, 555 F.3d 781, 788 (9th Cir. 2009) ("Whether employees are exempt from the requirements of the [FLSA] is primarily a question of fact." (alteration in original)). "'The question of how [employees] spent their time working . . . is a question of fact. The question whether their particular activities excluded them from [benefits] is a question of law . . . .'" Reber v. AIMCO/Bethesda Holdings, Inc., No. SA CV07–0607 DOC (RZx), 2008 WL 4384147, *4 (C.D. Cal. Aug. 24, 2008) (second, third, and fourth alterations in original) (quoting Icicle Seafoods, Inc. v. Worthington, 475 U.S. 709, 714 (1986)); accord In re Farmers Ins. Exch., Claims Representatives' Overtime Pay Litig., 481 F.3d 1119, 1127 (9th Cir. 2006); Ramirez v. Yosemite Water Co., 20 Cal. 4th 785, 794 (Cal. 1999).

Because overtime protections were enacted "for the protection and benefit of employees," they are to be "liberally construed with an eye to promoting such protection." Ramirez, 20 Cal. 4th at 794. Therefore, "exemptions from statutory mandatory overtime provisions are narrowly construed." Id. "In California, overtime exemption is an affirmative defense that must be pled and proved by the employer," Campbell, 642 F.3d at 825 (citing Ramirez, 20 Cal. 4th at 794-95), by a preponderance of the evidence, Gomez v. Lincare, Inc., 173 Cal. App. 4th 508, 516 (Cal. Ct. App. 2009). Accordingly, demonstrating that a grant of summary judgment is warranted requires Defendant to prove that "each essential element of the defense" is satisfied as a matter of law. See Campbell, 642 F.3d at 825.

The parties agree that demonstrating the applicability of the administrative exemption requires Defendant to establish that Adjusters satisfy five elements that are set forth in Wage Order 4-2001: (1) the Adjuster's "duties and responsibilities involve . . . [t]he performance of office or non-manual work directly related to management policies or general business operations of his/her employer or his[/her] employer's customers"; (2) the Adjuster "customarily and regularly exercises discretion and independent judgment"; (3) the Adjuster "performs under

only general supervision work along specialized or technical lines requiring special training, experience, or knowledge";[8] (4) the Adjuster is "primarily engaged in duties that meet the test of the exemption"; and (5) the Adjuster "earn[s] a monthly salary equivalent to no less than two . . . times the state minimum wage for full-time employment."  See Cal. Code Regs. tit. 8, § 11040(1)(A)(2).  Here, Plaintiff maintains that disputed issues of material fact remain as to the first, second, and third—and hence the fourth—prongs of the administrative exemption test.

### b.  Relevance of Federal Administrative Exemption

Wage Order 4-2001 establishes a role for certain federal regulations promulgated under the FLSA.  In relevant part, Wage Order 4-2001 provides as follows: "The activities constituting exempt work and non-exempt work shall be construed in the same manner as such terms are construed in the following regulations under the [FLSA] effective as of the date of this order: 29 C.F.R. §§ 541.201-205, 541.207-208, 541.210, and 541.215."  See Cal. Code Regs. tit. 8, § 11040(1)(A)(2)(f).  Thus the versions of the federal regulations that existed in 2001—which were promulgated in 2000—were incorporated into Wage Order 4-2001.

The California Supreme Court has explained that Wage Order 4-2001 is "construed in light of [certain] incorporated federal regulations."  Harris v. Superior Court, 53 Cal. 4th 170, 179 (Cal. 2011).  The court further explained that "*only* those federal regulations *specifically* cited in [the IWC] wage orders, and in effect at the time of promulgation of th[e] wage orders, . . . apply in defining exempt duties under California law."  Id. at 180 (citing Wage Order 4-2001 Commission Statement).

The 2000 version of the incorporated federal regulations closely tracks the language of Wage Order 4-2001 and provides definitions for the relevant terms.  For example, as discussed below, 29 C.F.R. § 541.205 (2000) addresses the meaning of the phrase, "directly related to management policies or general business operations of his/her employer or his[/her] employer's customers."  However, in 2004, the DOL reorganized and rewrote some of the applicable regulations.  For instance, 29 C.F.R. § 541.205 was removed from the regulations; instead, 29 C.F.R. § 541.201 now addresses the meaning of the "directly related" requirement.

The 2004 version of the federal regulations also inserts new language into 29 C.F.R. § 541.203.  That new language directly addresses the applicability of the administrative exemption to claims adjusters:

> *Insurance claims adjusters generally meet the duties requirements*
> *for the administrative exemption*, whether they work for an
> insurance company or other type of company, *if* their duties
> include activities such as interviewing insureds, witnesses and

---

[8] At oral argument, Defendant raised a wholly new argument, contending that California Labor Code Section 515(a) does not require the satisfaction of the third prong of Wage Order 4-2001, which requires "only general supervision" of the employee.  The Court declines to address this argument, which Defendant admits was not raised in its papers.

> physicians; inspecting property damage; reviewing factual information to prepare damage estimates; evaluating and making recommendations regarding coverage of claims; determining liability and total value of a claim; negotiating settlements; and making recommendations regarding litigation.

29 C.F.R. § 541.203(a) (2004) (emphasis added). Thus the current version of the DOL regulations specifically provides that, if Adjusters' duties include certain types of tasks, they are generally exempt from overtime requirements. See id.; In re Farmers, 481 F.3d at 1124.

In the case of In re Farmers, the Ninth Circuit addressed the language of 29 C.F.R. § 541.203(a) in a case involving whether claims adjusters were exempt from overtime under the FLSA. See In re Farmers, 481 F.3d at 1127-28. The Ninth Circuit held that, although section 541.203(a) had not been enacted before the plaintiffs filed their case, that section "d[id] not represent a change in the law"; the DOL had explained that the new section was "consistent with" the former version of the regulations. Id. at 1128. Based on section 541.203(a), the panel held that the claims adjusters were exempt from overtime requirements because, after a bench trial, the trial court had found that the plaintiffs had engaged in the specific tasks set forth in section 541.203(a). Id. at 1124, 1129.

A few years after the Ninth Circuit decided In re Farmers, the California Supreme Court reviewed a case involving the application of California's administrative exemption to claims adjusters. See Harris, 53 Cal. 4th at 175. The court reversed a grant of summary judgment in the employees' favor, holding that the lower courts had applied the wrong test and erroneously concluded that the class of claims adjusters did not fit within the administrative exemption as a matter of law. See id. at 109. The court explained that the California Labor Code, wage orders, and incorporated federal regulations must be read together as forming "an explicit and extensive framework for analyzing the administrative exemption." Id. at 182. The court stressed that, when considering the "directly related" prong of that framework, trial courts must consider the 2000 version of 29 C.F.R. § 541.205(a), (b), and (c). See id. at 188. Thus the California Supreme Court continued to look to the 2000 version of the federal regulations, and not the 2004 version, even though the Ninth Circuit had held in In re Farmers that the 2004 changes had not represented a change in the law. Instead, the court noted that, in In re Farmers, the Ninth Circuit had "held that under more recent applicable federal regulations, claims adjusters are exempt from the [FLSA]'s overtime requirements 'if they perform activities such as interviewing witnesses, making recommendations regarding coverage and value of claims, determining fault and negotiating settlements.'" Harris, 53 Cal. 4th at 189 (citing In re Farmers, 481 F.3d at 1124). The California Supreme Court went on to note that the Ninth Circuit's decision was "instructive because regulations enacted by the [DOL] after Wage Order 4-2001 were intended to be consistent with the old regulations." Id. at 189 n.8 (citing In re Farmers, 481 F.3d at 1128-29). Hence, the court did not describe the Ninth Circuit's opinion as controlling, but rather as merely "instructive." Moreover, when remanding the case to the appellate court, the California Supreme Court did not instruct the appellate court to apply 29 C.F.R. § 541.203, and instead referred to the analytical framework established under the former version of the federal regulations.

Accordingly, the Court applies the analytical framework set out by the California Supreme Court in Harris. The Court looks to the Ninth Circuit's opinion in In re Farmers, as well as the 2004 version of the applicable federal regulations, only as "instructive" or persuasive authority.

## 2.  California's Five-Part Test

Having set out the applicable framework and the relevance of federal FLSA regulations, the Court now applies California's five-part test for determining the applicability of the administrative exemption. In approaching this analysis, the Court is cognizant that California exemptions are "narrowly construed." Ramirez, 20 Cal. 4th at 794. The Court determines that, while the first and fifth prongs of the administrative exemption test are satisfied as a matter of law, summary judgment is inappropriate as to the second, third, and fourth prongs.

### a.  Directly Related to Management Policies or Business Operations

As noted above, Defendant must first establish that the Adjusters' "duties and responsibilities involve . . . [t]he performance of office or non-manual work directly related to management policies or general business operations of his/her employer or his[/her] employer's customers." Cal. Code Regs. tit. 8, § 11040(1)(A)(2)(a)(I). It is clear that Adjusters perform "office or non-manual work" and thus the Court need only consider whether their work was directly related to management or business operations.

The 2000 version of 29 C.F.R. § 541.205 addresses the meaning of the phrase, "directly related to management policies or general business operations of his employer or his employer's customers." In Harris, the California Supreme Court interpreted that federal regulation as setting forth the following definition of the "directly related" phrase: "[w]ork qualifies as 'directly related' if it satisfies two components. First, it must be *qualitatively* administrative. Second, *quantitatively*, it must be of substantial importance to the management or operations of the business." Harris, 53 Cal. 4th at 181 (interpreting 29 C.F.R. § 541.205(a) (2000)). Thus, for summary judgment to be appropriate, Defendant must demonstrate the satisfaction of both parts of that test.

### i.  Qualitatively Administrative

The first part of the direct-relationship test involves determining whether an employee's work is qualitatively administrative. In Harris, the California Supreme Court looked to the 2000 version of 29 C.F.R. § 541.205(b) as describing the requirements of the qualitative component of administrative work. Harris, 53 Cal. 4th at 182. In relevant part, that subsection of the regulation states as follows:

> The administrative operations of the business include the work performed by so-called *white-collar employees* engaged in 'servicing' a business as, for example, advising the management, *planning*, *negotiating*, representing the company, purchasing, promoting sales, and business research and control.

29 C.F.R. § 541.205(b) (2000) (emphasis added).

As described above, Adjusters engage in non-manual work which includes developing plans of action for resolving claims and negotiating settlements related to workers' compensation claims. (SUF ¶ 2.) In her Opposition, Plaintiff does not raise any argument disputing Defendant's assertion that Adjusters' work is qualitatively administrative. (Mot. at 10.) Accordingly, the Court holds that this prong of the administrative exemption test is satisfied.

### ii.      Quantitatively Administrative

The second part of the direct-relationship test requires that an employee's work be quantitatively administrative—thus, it must be "of substantial importance to the management or operations of the business," Harris, 53 Cal. 4th at 181. The 2000 version of 29 C.F.R. § 541.205(c) further explicates the "quantitative component that tests whether work is of 'substantial importance' to management policy or general business":

> As used to describe work of *substantial importance* to the management or operation of the business, the phrase 'directly related to management policies or general business operations' is not limited to persons who participate in the formulation of management policies or in the operation of the business as a whole. Employees whose work is 'directly related' to management policies or to general business operations include those [whose] work affects policy or whose responsibility it is to execute or carry it out. The phrase also includes a wide variety of persons who either carry out major assignments in conducting the operations of the business, or whose work affects business operations to a substantial degree, even though their assignments are tasks related to the operation of a particular segment of the business.
>
> (1) *It is not possible to lay down specific rules that will indicate the precise point at which work becomes of substantial importance to the management or operation of a business.* It should be clear that the cashier of a bank performs work at a responsible level and may therefore be said to be performing work directly related to management policies or general business operations. On the other hand, the bank teller does not. Likewise it is clear that bookkeepers, secretaries, and clerks of various kinds hold the run-of-the-[mill] positions in any ordinary business and are not performing work directly related to management policies or general business operations. On the other hand, a tax consultant employed either by an individual company or by a firm of

consultants is ordinarily doing work of substantial importance to the management or operation of a business.

(2) An employee performing routine clerical duties obviously is not performing work of substantial importance to the management or operation of the business even though he may exercise some measure of discretion and judgment as to the manner in which he performs his clerical tasks . . . .

(3) Some firms employ persons whom they describe as 'statisticians.'  If all such a person does, in effect, is to tabulate data, he is clearly not exempt.  However, if such an employee makes analyses of data and draws conclusions which are important to the determination of, or which, in fact, determine financial, merchandising, or other policy, clearly he is doing work directly related to management policies or general business operations . . . .

(4) Another example of an employee whose work may be important to the welfare of the business is a buyer of a particular article or equipment in an industrial plant or personnel commonly called assistant buyers in retail or service establishments . . . .

(5) *The test of 'directly related to management policies or general business operations' is also met by many persons employed as* advisory specialists and consultants of various kinds, credit managers, safety directors, *claim agents and adjusters*, wage-rate analysts, tax experts, account executives of advertising agencies, customers' brokers in stock exchange firms, promotion men, and many others.

(6) It should be noted in this connection that an employer's volume of activities may make it necessary to employ a number of employees in some of these categories.  The fact that there are a number of other employees of the same employer carrying out assignments of the same relative importance or performing identical work does not affect the determination of whether they meet this test so long as the work of each such employee is of substantial importance to the management or operation of the business.

29 C.F.R. § 541.205(c) (2000) (emphasis added) (quoted in <u>Harris</u>, 53 Cal. 4th at 181 n.6 (alterations in original)).

The Ninth Circuit has explained that whether an employee's work is of substantial importance to management or business operations is a "fact-intensive" inquiry.  <u>See</u> <u>Campbell</u>, 642 F.3d at 832.  And, as stated in 29 C.F.R. § 541.205(c)(1) (2000) above, "[i]t is not possible to lay down specific rules that will indicate the precise point at which work becomes of

substantial importance to the management or operation of a business."  However, 29 C.F.R. § 541.205(c)(5) (2000) also states that "claim agents and adjusters" is one category of employee that often satisfies the direct-relationship test.  The Ninth Circuit clarified in In re Farmers that this mention in the 2000 regulation was meant to reference insurance claims adjusters.  See In re Farmers, 481 F.3d at 1128.  Nonetheless, because the tasks of a claims adjuster may vary widely among different employers, the Court cannot rely on the job title of "claims adjuster" as settling the present dispute and must instead consider the specific facts of this case.

Defendant points to numerous undisputed facts as establishing that Adjusters' work is of substantial importance to the management or operations of Defendant's business.  For example, Adjusters set reserves and negotiate settlements for Defendant's clients.  (SUF ¶ 2.)  Those roles are important to clients; under-reserving a claim can lead to legal consequences, and over-reserving a claim ties up money that the client could use for other purposes.  (SUF ¶¶ 36-37.)  In total, each Adjuster was regularly responsible for millions of dollars of reserve funds.  (SUF ¶¶ 38-39.)

Plaintiff counters that Adjusters' work was not of substantial importance to the management or operations of the business because Adjusters did not have the authority to formulate management or operating policies and to waive or violate established policies of Defendant.  (Opp'n at 13; SAF ¶¶ 10-12.)  Those facts do not call into question whether Adjusters' work was of substantial importance to management or operations.  An employee need not formulate policies to satisfy the quantitative component of the direct-relationship test.  In fact, 29 C.F.R. § 541.205(c) (2000) expressly states that "the phrase 'directly related to management policies or general business operations' is not limited to persons who participate in the formulation of management policies or in the operation of the business as a whole."

Plaintiff also points to regulatory language stating that "[a]n employee performing routine clerical duties obviously is not performing work of substantial importance to the management or operation of the business even though he may exercise some measure of discretion and judgment as to the manner in which he performs his clerical tasks, 29 C.F.R. § 541.205(c)(2); however, Plaintiff fails to highlight any facts supporting the conclusion that Adjusters' work consists of "routine clerical duties."  Although Plaintiff points out that Adjusters were lower level employees within Defendant's company, the Ninth Circuit has explained that, even if an employee is "on the low end of [an employer's] hierarchy, we see no authority that would bar their . . . work from meeting [the direct-relationship] test as a matter of law."  Campbell, 642 F.3d at 832.  Accordingly, the Court is unable to conclude that, based on the evidence presented by Plaintiff, Adjusters work consists of routine clerical duties.  The Court concludes that Adjusters' work was of substantial importance to the management or operations of Defendant's business.

In sum, Defendant has demonstrated that Adjusters' work is both qualitatively and quantitatively administrative.  Thus the Court concludes that Adjusters perform "office or non-manual work directly related to management policies or general business operations" of the employer or clients.  The first prong of the administrative exemption test is therefore satisfied.

### b. Discretion and Independent Judgment on Matters of Significance

The second prong of the administrative exemption test requires Defendant to demonstrate that Adjusters "customarily and regularly exercise[] discretion and independent judgment." Cal. Code Regs. tit. 8, § 11040(1)(A)(2)(b). The 2000 version of 29 C.F.R. § 541.207 sets forth a definition of "discretion and independent judgment":

> (a) In general, the exercise of discretion and independent judgment involves the comparison and the evaluation of possible courses of conduct and acting or making a decision after the various possibilities have been considered. The term . . . implies that the person has the authority or power to make an independent choice, free from immediate direction or supervision and with respect to matters of significance. . . .
> (b) The term must be applied in the light of all the facts involved in the particular employment situation in which the question arises. It has been most frequently misunderstood and misapplied by employers and employees in cases involving the following: (1) [c]onfusion between the exercise of discretion and independent judgment, and the use of skill in applying techniques, procedures, or specific standards; and (2) misapplication of the term to employees making decisions relating to matters of little consequence.

29 C.F.R. § 541.207(a)-(b) (2000). Thus the regulation highlights two common areas of confusion that emerge when determining whether an employee fits within the exemption.

Defendant points to various facts in support of its argument that Adjusters regularly exercise discretion and independent judgment when deciding matters of significance. (Mot. at 12-21.) Specifically, Defendant highlights Adjusters' roles of investigating claims as well as possible fraud and subrogation, making compensability recommendations, developing plans for handling claims, setting reserves, negotiating settlements, and working with legal counsel when claims are litigated. (Mot. at 13-19.) However, Plaintiff disputes many of Defendant's assertions of discretion and independent judgment and points to various contrary facts.

With regard to investigating claims, Defendant notes that it does not provide Adjusters comprehensive scripts or templates for use when conducting interviews. (SUF ¶ 11; SGI ¶ 11.) However, Plaintiff disputes the level of discretion involved in interviews because Defendant provides an outline of the information that Adjusters must obtain during an interview. (SGI ¶ 12; Best Practices at 217). As for investigations of possible fraud or subrogation, the parties again dispute the level of independent judgment involved. While Defendant asserts that Adjusters make credibility assessments, recommend specific courses of action, and direct investigators who are hired to look into possible fraud, (SUF ¶¶ 17-20), Plaintiff testified that she relied on objective indicators of fraud and relied on "higher ups" to decide whether to engage an investigation unit or to approve turning over the file to the Department of Insurance. (SGI ¶¶ 17, 21.)

The parties also dispute the degree of discretion involved in making recommendations as to whether to accept a particular insurance risk.  Adjusters base their recommendations on guidelines contained in the California Labor Code.  (SAF ¶¶ 46-47.)  While Defendant asserts that supervisor approval "may" be necessary when recommending a denial, (SUF ¶ 28), Defendant's Best Practices document states that written supervisor approval is required before denying or delaying any benefits, (SGI ¶ 24; Best Practices at 199).

It is undisputed that Adjusters develop a plan of action for resolving each claim.  (SUF ¶ 30.)  They also set reserves for each claim.  (SUF ¶¶ 33, 35.)  The parties agree that Adjusters apply their knowledge, experience, and evaluation of intangible factors when determining the appropriate reserve.  (SUF ¶¶ 33-34, 42.)  However, the parties dispute the level of discretion and independent judgment involved in setting a reserve.  Although the parties agree that various tools assist Adjusters in setting the reserve, and that no formula precisely determines each reserve, (SUF ¶ 40; SGI ¶ 40), they disagree as to how much is left to the discretion of Adjusters after using the various tools.  The Best Practices document instructs Adjusters to look to a number of specific factors, (SUF ¶ 80), and includes a worksheet that assists with calculating the reserve, (Best Practices at 218; Ponta Depo. 2 at 56-57), but the parties dispute whether the Best Practices document provides mandatory instructions or merely recommends helpful practices, (SAF ¶ 49; RSAF ¶ 49).  Plaintiff argues that Adjusters utilize MIRA to predict the appropriate level of reserves and that an Adjuster must explain anything more than a ten percent deviation from MIRA's predicted reserve.  (SGI ¶¶ 33-34; Ponta Depo. 1 at 129-130.)  Moreover, Plaintiff asserts that Adjusters utilize a permanent rating guide that provides a formula for determining the degree of permanent disability associated with particular injuries.  (SGI ¶ 40.)

Defendant also notes that, with regard to negotiating settlements and litigating claims, Adjusters have some discretion.  For claimants that have been declared "permanent and stationery," Adjusters can determine an appropriate settlement offer and engage in settlement talks.  (SUF ¶¶ 66-67.)  If a settlement amount is within an Adjuster's authority, she may make a settlement offer without preapproval from a supervisor, (SUF ¶ 68), but otherwise, the Adjuster can seek preapproval from a supervisor or the client, (SUF ¶ 70).  Further, when claims are litigated, Adjusters work with defense counsel, and may offer advice as to what depositions should be taken and which records should be subpoenaed.  (SUF ¶¶ 63, 65.)

Based on the foregoing, Plaintiff argues that Defendant has failed to establish Adjusters' exercise of sufficient discretion and independent judgment for two reasons.  First, Plaintiff contends that Adjusters are not "free from immediate direction or supervision" based on the degree of supervision to which they are regularly subjected.  Second, Plaintiff asserts that Adjusters exercise skill as opposed to actual discretion.

### i.      Non-Final Decisions

Plaintiff contends that the Court should not consider Adjusters as exercising independent judgment and discretion because they did not render final decisions.  (Opp'n at 16-17.)  Subsection (e) of 29 C.F.R. § 541.207 addresses the significance of whether an employee's judgments are final:

(e) *Final decisions not necessary.* (1) The term ''discretion and independent judgment'' . . . *does not necessarily imply that the decisions made by the employee must have a finality that goes with unlimited authority and a complete absence of review.* The decisions made as a result of the exercise of discretion and independent judgment may consist of recommendations for action rather than the actual taking of action. The fact that an employee's decision may be subject to review and that upon occasion the decisions are revised or reversed after review does not mean that the employee is not exercising discretion and independent judgment . . . . For example, the assistant to the president of a large corporation may regularly reply to correspondence addressed to the president. Typically, such an assistant will submit the more important replies to the president for review before they are sent out. Upon occasion, after review, the president may alter or discard the prepared reply and direct that another be sent instead. This section by the president would not, however, destroy the exempt character of the assistant's function, and does not mean that he does not exercise discretion and independent judgment in answering correspondence and in deciding which replies may be sent out without review by the president.

(2) The policies formulated by the credit manager of a large corporation may be subject to review by higher company officials who may approve or disapprove these policies. The management consultant who has made a study of the operations of a business and who has drawn a proposed change in organization, may have the plan reviewed or revised by his superiors before it is submitted to the client. The purchasing agent may be required to consult with top management officials before making a purchase commitment for raw materials in excess of the contemplated plant needs for a stated period, say 6 months. These employees exercise discretion and independent judgment within the meaning of the regulations despite the fact that their decisions or recommendations are reviewed at a higher level.

29 C.F.R. § 541.207(e) (2000). Thus, contrary to Plaintiff's assertions, Subsection (e) expressly provides that an employee's decisions need not be final and can be subject to review. Id. The examples provided in the regulation—of a recommendation to a president or management officials—are only examples and are not intended to limit acceptable recommendations to those two categories. Id. The mere fact that Plaintiff's recommendations do not fall within those expressly provided categories is not sufficient to require submission of this case to a jury.

### ii.     Skill versus Discretion

Plaintiff also asserts that Adjusters merely use skill in applying specific standards and do not actually exercise discretion.  (Opp'n at 14-16.)  As noted above, the 2000 version of 29 C.F.R. § 541.207 points out two common areas of confusion inherent in deciding whether an employee exercises sufficient discretion and independent judgment: (i) the difference between discretion and use of skill, and (ii) the distinction between exercising discretion on matters of significance or matters of little consequence.  See 29 C.F.R. § 541.207(b) (2000).

The regulation then further explores those two areas of confusion.  Particularly relevant to Plaintiff's argument is the discussion of the discretion-versus-skill distinction:

> Perhaps the most frequent cause of misapplication of the term ''discretion and independent judgment'' is the failure to distinguish it from the use of skill in various respects.  An employee who merely applies his knowledge in following prescribed procedures or determining which procedure to follow, or who determines whether specified standards are met or whether an object falls into one or another of a number of definite grades, classes, or other categories, with or without the use of testing or measuring devices, is not exercising discretion and independent judgment . . . .  This is true even if there is some leeway in reaching a conclusion, as when an acceptable standard includes a range or a tolerance above or below a specific standard.

29 C.F.R. § 541.207(c)(1) (2000).  The regulation then provides various examples of instances in which an employee merely applies skill and procedures as opposed to exercising discretion and independent judgment, including those who perform "ordinary inspection work"; "examiners or graders," such as of lumber; "personnel clerk[s]" who screen applicants for employment, and retail store employees who complete "comparison shopping."  29 C.F.R. § 541.207(c)(2)-(7).

Plaintiff attempts to liken Adjusters to non-exempt inspectors, which is one example of workers who employ skill as opposed to discretion, as provided in 29 C.F.R. § 541.207(c)(2).  (Opp'n at 14-15.)  That section of the regulation provides as follows:

> A typical example of the application of skills and procedures is ordinary inspection work of various kinds.  Inspectors normally perform specialized work along standardized lines involving well-established techniques and procedures which may have been cataloged and described in manuals or other sources.  Such inspectors rely on techniques and skills acquired by special training or experience.  They may have some leeway in the performance of their work but only within closely prescribed limits.  Employees of this type may make recommendations on the basis of the information they develop in the course of their inspections (as for example, to accept or reject an insurance risk or

> a product manufactured to specifications), but these
> recommendations are based on the development of the facts as to
> whether there is conformity with the prescribed standards.  In such
> cases a decision to depart from the prescribed standards or the
> permitted tolerance is typically made by the inspector's superior.
> The inspector is engaged in exercising skill rather than discretion
> and independent judgment . . . .

29 C.F.R. § 541.207(c)(2) (2000).  Plaintiff argues that Adjusters' role of recommending whether to provide compensation for a workers' compensation claim was nothing more than "mak[ing] recommendations on the basis of the information they develop in the course of their inspections . . . to accept or reject an insurance risk."  29 C.F.R. § 541.207(c)(2) (2000).  Plaintiff explains that, just as inspectors "make recommendations . . . based on the development of the facts as to whether there is conformity with the prescribed standards," 29 C.F.R. § 541.207(c)(2) (2000), so too do Adjusters merely apply standards prescribed by California's workers' compensation laws. (Opp'n at 15.)  Moreover, like inspectors, Adjusters "perform specialized work along standardized lines involving well-established techniques and procedures which . . . have been cataloged and described in" Defendant's Best Practices document.  (Opp'n at 15 (quoting 29 C.F.R. § 541.207(c)(2) (2000)).)

Although the Court observes differences between Adjusters and inspectors, the Court nonetheless concludes that a jury could find that Adjusters merely utilize skill and do not actually exercise discretion and independent judgment, particularly on matters of significance. When the facts are viewed in the light most favorable to Plaintiff, the jury could potentially conclude that an Adjuster follows strict procedures and standards set out by Defendant and "merely applies his knowledge in following prescribed procedures or determining which procedure to follow, or . . . determines whether specified standards are met."  See 29 C.F.R. § 541.207(c)(1) (2000).  Given the fact-intensive nature of this prong of the administrative exemption test, and the numerous factual disputes in the record, it would be improper to dispose of this issue on summary judgment.

The Court is conscious of the California Court of Appeal's explanation that "merely because an employer requires adherence to regulations, guidelines or procedures does not mean an executive does not exercise discretion or judgment."  In re United Parcel Service Wage and Hour Cases, 190 Cal. App. 4th 1001 (Cal. Ct. App. 2010).[9]  As the California Court of Appeal further explained, wage orders cannot be interpreted without considering the reality that "[t]he modern workplace is a regulated workplace (e.g., safety and health provisions . . . , antidiscrimination provisions . . .), often overlayed by internal policies and procedures (e.g., personnel policies, union contracts, quality control guidelines)."  Id.  Nevertheless, the court recognized that "an employee constrained by stringent protocols mandating a particular outcome to routine tasks would not be exercising discretion of the type contemplated by [the wage

---

[9] Although the quoted language addressed the executive exemption (i.e., Wage Order 9), the court incorporated that discussion into its analysis of the administrative exemption and concluded that the administrative exemption was also satisfied.  Id. at 1030.

order]." <u>Id.</u>  Thus the Court of Appeal recognized a distinction between situations in which "government regulations or internal employer policies and procedures simply *channel* the exercise of discretion and judgment, as opposed to *eliminating* it entirely or otherwise constraining it to a degree where any discretion is largely inconsequential." <u>Id.</u>

Given the factual disputes discussed above, the Court cannot conclude that no reasonable jury could find that Defendant constrained Adjusters' discretion such that it became largely inconsequential.  Moreover, a reasonable jury could conclude that any independent judgment exercised by Adjusters related to matters of little significance.  The 2000 version of 29 C.F.R. § 541.207(d) expands upon the question of whether discretion is exercised in relation to significant or insignificant matters.  In relevant part, that regulation provides as follows:

> (1) The second type of situation in which some difficulty with this phrase has been experienced relates to the level or importance of the matters with respect to which the employee may make decisions.  *In one sense almost every employee is required to use some discretion and independent judgment.*  Thus, it is frequently left to a truck[ ]driver to decide which route to follow in going from one place to another; the shipping clerk is normally permitted to decide the method of packing and the mode of shipment of small orders; and the bookkeeper may usually decide whether he will post first to one ledger rather than another.  Yet it is obvious that these decisions do not constitute the exercise of discretion and independent judgment of the level contemplated by the regulations in subpart A of this part.  The divisions have consistently taken the position that *decisions of this nature concerning relatively unimportant matters are not those intended by the regulations* . . . , but that the discretion and independent judgment exercised must be *real and substantial, that is, they must be exercised with respect to matters of consequence*.  This interpretation has also been followed by courts in decisions involving the application of the regulations in this part, to particular cases.
>
> (2) It is not possible to state a general rule which will distinguish in each of the many thousands of possible factual situations between the making of real decisions in significant matters and the making of choices involving matters of little or no consequence.  It should be clear, however, that the term ''discretion and independent judgment,'' within the meaning of the regulations . . . , does not apply to the kinds of decisions normally made by *clerical and similar types of employees*.  The term does apply to the kinds of decisions normally made by persons who formulate or participate in the formulation of policy within their spheres of responsibility or who exercise authority within a wide range to commit their employer in substantial respects financially or otherwise.  The regulations . . . , however, do not require the

> exercise of discretion and independent judgment at so high a level. The regulations . . . also contemplate the kind of discretion and independent judgment exercised by an administrative assistant to an executive, who without specific instructions or prescribed procedures, arranges interviews and meetings, and handles callers and meetings himself where the executive's personal attention is not required.  It includes the kind of discretion and independent judgment exercised by a customer's man in a brokerage house in deciding what recommendations to make to a customer for the purchase of securities.  It may include the kind of d[i]scretion and judgment exercised by buyers, certain wholesale salesmen, representatives, and other contact persons *who are given reasonable latitude in carrying on negotiation* on behalf of their employers.

29 C.F.R. § 541.207(d) (2000) (emphasis added).  As the regulations explain, most exempt and non-exempt employees are required to exercise some discretion and independent judgment in one sense or another.  See 29 C.F.R. § 541.207(d)(1) (2000).  For example, a jury could conclude that an Adjuster's discretion in selecting the exact questions to ask during an interview, based on a pre-set outline listing the information to be obtained, constitutes discretion as to a relatively unimportant matter.  Again, this fact-intensive inquiry is not conducive to resolution upon summary judgment and is better-suited for determination by a finder of fact.

In sum, Defendant has not met its burden of demonstrating that the second prong of the administrative exemption is satisfied as a matter of law.

### c.  General Supervision and Special Training, Experience, or Knowledge

When addressing the third prong of the administrative exemption, Defendant must demonstrate that the Adjuster "performs under only general supervision work along specialized or technical lines requiring special training, experience, or knowledge."  Cal. Code Regs. tit. 8, § 11040(1)(A)(2)(d).  This prong of the administrative exemption test includes two components: first, the employee must perform "work along specialized or technical lines requiring special training, experience, or knowledge," and, second, the employee's work must be performed "under only general supervision."

As to the first requirement, Plaintiff readily acknowledges that, when performing their work, Adjusters rely on techniques acquired by special training or years of experience.  (Opp'n at 16; SAF ¶¶ 41-44.)  Thus the first part of the third prong is satisfied.

With regard to the second requirement, Plaintiff contests Defendant's assertion that Adjusters receive only general supervision.  (Opp'n at 11-12.)  Defendant repeats its arguments from the discussion of prong two, above, that various tasks were within Adjusters' discretion and did not require supervisor approval.  (Mot. at 22.)  Defendant further argues that, although claims supervisors review Adjusters' claims—reviewing each claim every thirty to ninety days—such reviews constitute mere "check-ups" to ensure claims are properly documented.  (Mot. at 23;

SUF ¶ 106.)  As explained above, however, the parties dispute the extent and purpose of the supervision of Adjusters' work.  Plaintiff points to the Claims Supervisor Job Description, which states that those supervisors "actively manage[] assigned adjusters['] workloads and performance."  (SAF ¶ 16.)  Plaintiff further disputes the frequency with which claims supervisors use metric reports to evaluate Adjusters' work, noting that Defendant's 30(b)(6) deponent, Ponta, testified that supervisors are to review certain such reports every day.  (Ponta Depo. 1 at 73-74.)  Defendant disagrees that this frequency of review was expected or even possible.  (SUF ¶ 107; SGI ¶ 107.)  In addition, the parties dispute whether claims supervisors have access to, and actually access, Adjusters' email to check whether Adjusters review their new email within twenty-four hours of receipt.  While Ponta testified that supervisors do so, (Ponta Depo. 1 at 41), one of Plaintiff's former supervisors, Grant, testified that she did not conduct such reviews, (Grant Depo. at 93).

In sum, numerous factual disputes appear in the record before the Court as to the extent of the supervision exercised over Adjusters.  When the facts are viewed in the light most favorable to Plaintiff, the Court cannot conclude that no reasonable jury could find that Plaintiff and other Adjusters performed under more than "general supervision."  Thus the Court must echo the Ninth Circuits conclusion in <u>Campbell</u>: "Without better guidance on the legal definition of 'general supervision,' this highly contested fact issue can be resolved only after trial." <u>Campbell</u>, 642 F.3d at 832.  Accordingly, summary judgment is inappropriate on the third prong of the administrative exemption test.

### d.  Primarily Engaged in Work Satisfying Exemption

Fourth, Defendant must establish that Adjusters are primarily engaged in work satisfying the exemption.  The requirement that employees be "primarily engaged" in certain work requires that, "in order to be covered by the administrative exemption under [Wage Order 4-2001], employees must spend over one-half of their work time dong work that fits the test of the exemption." <u>Harris</u>, 53 Cal. 4th at 178 n.3 (citing Cal. Code Regs. tit. 8, § 11040(2)(N)).  Relevant to considering whether at least half of a workers time is spent on exempt tasks, California Wage Order 4-2001 provides as follows:

> Exempt work shall include, for example, all work that is directly and closely related to exempt work and work which is properly viewed as a means for carrying out exempt functions.  The work actually performed by the employee during the course of the workweek must, first and foremost, be examined and the amount of time the employee spends on such work, together with the employer's realistic expectations and the realistic requirements of the job, shall be considered in determining whether the employee satisfies the requirement.

Cal. Code Regs. tit. 8, § 11040(1)(A)(2)(e).

As explained above, the Court cannot conclude that, as a matter of law, Adjusters performed under only general supervision when performing various activities.  Because Plaintiff

alleges that the supervision at issue was pervasive and extended to virtually all areas of an Adjuster's work, the Court also cannot conclude that at least half of the Adjusters' work involved exempt work.  Moreover, because the contours of any discretion exercised by Adjusters remain unclear, the Court cannot determine whether at least half of Adjusters' duties involve the requisite exercise of discretion and independent judgment.  Therefore, Defendant's motion for summary judgment cannot be granted as to the fourth prong of the administrative exemption test.

### e.  Minimum Salary Requirement

Plaintiff does not dispute that Adjusters earn at least two times the state minimum wage for full-time employment.  As described above, the annual salaries of Adjusters reflect payments that exceed the required salary threshold.  Accordingly, the Court holds that the fifth prong of the administrative exemption test is satisfied as a matter of law.

## E.  Meal Break Policy

Defendant also moves for summary judgment as to Plaintiff's claim that Defendant had a policy or practice of failing to provide meal breaks to class members.  (Mot. at 24-25.)  The meal break policy forms a part of Plaintiffs' first and fifth causes of action for Unfair Competition and PAGA penalties.  Defendant argues that, even if Adjusters do not fall under the administrative exemption discussed above, Defendant nevertheless provided meal breaks to its Adjusters.  (Mot. at 24.)  Unlike with the administrative exemption issue, the burden of proof for the meal break violation claim falls on Plaintiff.

The California Supreme Court has explained that, with regard to an employer's duty to provide meal breaks, "[t]he employer satisfies this obligation if it relieves its employees of all duty, relinquishes control over their activities and permits them a reasonable opportunity to take an uninterrupted 30-minute break, and does not impede or discourage them from doing so."  Brinker Rest. Corp. v. Superior Court, 53 Cal. 4th 1004, 1040 (Cal. 2012).  An employer need not ensure that employees take their breaks and don't perform work during them.  Id. at 1040-41.  However, an employer "may not undermine a formal policy of providing meal breaks by pressuring employees to perform their duties in ways that omit breaks" and may not "creat[e] incentives to forgo, or otherwise encourag[e] the skipping of legally protected breaks."  Id. at 1040.  Moreover, an employer would violate its legal responsibilities by adopting a "scheduling policy that ma[k]e[s] taking breaks extremely difficult."  Id. (citing Jaimez v. DAIOHS USA, Inc., 105 Cal. Rptr. 3d 443, 458 (Cal. Ct. App. 2010) ("The delivery schedules made it extremely difficult for [employees] to timely complete the deliveries and take all required rest breaks")).

As noted above, Defendant has a written policy that employees will generally be provided a meal period of approximately one hour each day.  (Employee HR Toolkit § 7.03.)  Defendant's 30(b)(6) witness, Neigel, reiterated this policy during his deposition.  (Neigel Depo. at 50-52.)  Moreover, Plaintiff testified that her "standard schedule" was to take a thirty-minute meal break each day, (Dobrosky Depo. at 182), and Grant, one of Plaintiff's supervisors, testified that she instructed Adjusters that they were required to take at least a thirty-minute lunch break, (Grant Depo. at 101-02).  Although Grant stated that some Adjusters did not take their lunch

break, an employer need not ensure that employees take their meal breaks and don't perform work during them.  Brinker Rest. Corp., 53 Cal. 4th at 1040.

Plaintiff has the burden to prove her meal break claim, and thus, at summary judgment, Plaintiff must make an affirmative showing in support of her claim.  See Celotex, 477 U.S. at 322.  Nevertheless, Plaintiff fails to cite any evidence that supports her meal break violation claim.  Although she cites to deposition testimony from three Adjusters, none of those Adjusters stated that they were prevented or unable to take a timely lunch break.  (Opp'n at 23; "Jelenicki Depo." at 112, 115-16, Bhowmik Decl., Ex. 16; "Maag Depo." at 130-33, Bhowmik Decl., Ex. 15; "Ortiz Depo." at 119, Bhowmik Decl., Ex. 13.)  To the contrary, one Adjuster affirmatively stated that "people were allowed a half an hour or hour-long lunch."  (Maag Depo. at 130.)  Plaintiff attempts to rely on an expert report, the purpose of which was to estimate damages, as providing evidence of Adjusters' missed meal breaks.  (Opp'n at 23; "Lietzow Report" at 3, Lietzow Decl., Ex. 1, Doc. No. 55-4.)  However, that report is an improper source of such evidence; moreover, it merely states that, according to certain, unspecified declarations from class members, Adjusters were regularly unable to take their lunch breaks.  (Lietzow Report at 3.)

Plaintiff also attempts to defeat summary judgment by pointing to potential gaps in the evidence presented by Defendant in support of its assertion that meal breaks were provided to Adjusters.  (Opp'n at 22-23.)  Even if Plaintiff succeeded in pointing to flaws, it is not Defendant's burden to prove that Adjusters were provided with meal breaks.  Because Plaintiff bears the burden of proof at trial, Defendant need not produce evidence negating or disproving every essential element of Plaintiff's claim.  See Celotex, 477 U.S. at 325.  Instead, Defendant's burden at summary judgment is met by pointing out an absence of evidence supporting Plaintiff's claim.  Id.  Defendant has succeeded in doing so.  Accordingly, summary judgment on Plaintiff's meal break claim is appropriate.

Therefore, the Court GRANTS Defendant's Motion with respect to Plaintiff's claim for meal break violations.

## IV. CONCLUSION

For the foregoing reasons, the Court GRANTS IN PART and DENIES IN PART Defendant's Motion for Summary Judgment.

The parties are also ORDERED to meet and confer regarding trial dates, and, by **June 1, 2015,** submit a joint stipulation indicating potential trial dates for this matter.  The Court will allow Defendant to either pursue the two motions in limine previously filed on April 20, 2015, (Doc. Nos. 62, 63), or, at least twenty-eight days before the pretrial conference, file up to two motions in limine to replace the previously filed motions in limine.

**IT IS SO ORDERED.**